The next case on our calendar this morning is number 19-3521 United States v. Van Manen. Mr. Ionella. Thank you, Your Honor. Good morning, Your Honors. Good morning, Mr. Finkel. I represent Paul Van Manen and, Your Honors, I would ask you to vacate the conviction here on the basis that the district court improperly precluded defense counsel at the jury trial from calling an expert witness, a toxicologist named Mark Powers. When the district court ultimately granted the government's motion to preclude such testimony, the district court specifically said it was granting the motion based upon the arguments having been made by the government. And the government's argument, both in their written submission to the court and in their oral argument, improperly relied in part on Rule 16 and one particular subdivision of Rule 16. Can we just, for the sake of argument, say that we agree with you on the Rule 16 argument? Tell me if I'm right. In the Rule 33 ruling, did the district court not say that even if Rule 16 did not apply, nevertheless, it would have been properly excluded under, I think it was 702? Is that right? Yes, I believe so, Your Honor. So would you mind just directing your attention to the 702? Because the district court said I would have excluded it on that basis anyway. Yes, Your Honor. So turning to Rule 702, it's a four-pronged test for the admission of testimony by an expert witness. And I think in this particular case, all those prongs were met. Specifically, the toxicologist, Mark Powers, did have specialized knowledge that would help the trier of fact. His testimony would have been did you proper to the district court as being the basis of his opinion? Well, the defense counsel at the trial level... Sorry, not you. That's fine. Argued that his expert testimony would not have diverged whatsoever from the government's expert. And in fact... Okay, I guess that raises two different issues. One, let's put aside for a moment, which is why it would not have been cumulative and therefore inadmissible for completely different reasons. And therefore, also, it's exclusion harmless. But just go back. Just saying it will yield the same testimony as someone else does not disclose the principles and methods and the data upon which the expert purports to rely. So would you just tell me where in the record the defense counsel proffered specific basis for the 702? I didn't see anywhere in the record where defense counsel specifically proffered that. But I think that is really due to the peculiar nature and circumstances of how this in saying, I don't intend to call these witnesses. And the district court inquired specifically about what the testimony might be and whether the government would have an objection. And defense counsel said, he didn't proffer specifically as your honor just said, because he said his experts at the time we were talking about two, he chose not to call one of the medical examiner or the doctor. At this point, we're only focused on the toxicologist. But he said his expert would not differ whatsoever from the testimony of the government's toxicologist. And then he stopped because when he said that, the district court jumped in and he said, okay, so you're not going to put the toxicologist on unless the government's toxicologist testifies to something different from what's already in the report. Then he turned to the government and he said, okay, that's the case. And the government said, well, under that circumstance, if the defense toxicologist is going to be testifying in accordance with the conclusions that are made by the government's toxicologist, then we have no objection to it coming in. And therefore defense counsel stopped at that time. He didn't continue to proffer. During this mandate. Tell me why it's not harmless though, because when counsel said, my expert will say the same thing as the government experts, that's fine. And there's no reason the district court could have chosen to allow in cumulative testimony, but why would it not have been cumulative? And therefore, if the only proffer is that it would have powers would have said the same thing as the government expert. Why is, what is the harm? What is the probative exculpatory evidence that would have been admitted, but was excluded? Well, that's why this case is so unusual. On the Friday night of the trial, which is May 10th. And my understanding, it was at the end of the trial day, not in the morning, at the end of the trial day, the government told the defense that it would no longer be calling its toxicologists. Instead, any testimony about the toxicology, the government felt it had already put it in through the OCME. Oh, that doesn't, that doesn't answer the question. I mean, there are two things going on here. One, you said that you would introduce this witness only if the government did certain things. The government did not do those things. So that would be reason enough for the court to exclude it. But additionally, what the government witness did say was what you said that this witness would say. So how can it be harmful? Well, the defense was sandbagged because they, they didn't realize. I understand that the defense was sandbagged and that the defense wanted to introduce this witness. That's fine. But simply being sandbagged does not make this they would have cross-examined the OCME differently. So that's one of the reasons. And number two, I don't believe that the Dr. Cedar Roth, the government's medical expert, did testify to what the toxicologist would have testified to. The government's witness said that it was the combined effects of the three drugs created a type of acute toxicity. Uh, and that was the cause of death, the combined effect. And what the defense attorney was trying to put on through his toxicologist was that the heroin by itself would not have been enough to cause death, but the fentanyl. But in any event, didn't your client wasn't there evidence that your client didn't only, uh, give heroin, but also gave the other drugs. So that event, I mean, if the question is, uh, yeah, I mean, I can understand the situation where your client gave only heroin. And the question was whether heroin by itself was enough, but your client under the evidence given gave the other drugs as well. And to add to that, and maybe you could respond to this as well. Didn't the jury make a specific finding that he also distributed fentanyl? Yes, they did. Yes. It was a verdict on that. If the excluded testimony is only relevant to prove, hey, maybe this guy died of something my client didn't distribute. And you would have introduced evidence. He might have died not of heroin at all, but of fentanyl. That is only a harmful argument. If you could also convince the jury that your client had not distributed the fentanyl, but once they found beyond a reasonable doubt that he distributed fentanyl doesn't this toxicology defense really go out the window? Because it only works if you convince the jury of the two propositions. Fentanyl could kill and I didn't distribute fentanyl. And well, then you're on it. Then you open up, you're out the window. And then you open up a whole different, uh, part of the case. Uh, and, and those are covered pretty extensively in my brief. For example, I, I, you have the 0.2, which the jury's verdict was based in part, uh, upon an excited, excited utterance. And it was excited, but it didn't comply with rule. Uh, Mr. You know, you're, you're well over your time. You, you have reserved a few minutes for rebuttal. So we'll come back to you. Okay. Yes, Your Honor. Thank you very much, Mr. Finkel. May it please the court. My name is Ryan Finkel for the United States. I'm an assistant United States attorney for the Southern district of New York. And I represent the United States on this appeal as I did during the trial below. Um, I think I should start first with the harmlessness issue with respect to the expert. The court is exactly correct. The jury found beyond a reasonable doubt that the conspiracy, which Paul Van Manen was a part of distributed both heroin and fentanyl. And of course that verdict is consistent with the evidence in particular with respect to the scene at which Michael Agno's body was found next to his body were several glass scenes, several envelopes of drug residue. And that drug residue tested positive both for heroin and fentanyl. Uh, and those glass scene envelopes were consistent with the hallmarks of the type of envelopes that this conspiracy distributed a single folded envelope, either clear or blue in color. Um, so what the appellant has not demonstrated and cannot demonstrate is how, even if Dr. Powers should have been able to testify, how his testimony would in any way affect the verdict in this case. And I would also add that his testimony is at most, at most duplicative of what Dr. Cedar Roth, the, the, uh, government's expert who did testify a spoke about. She was quite clear when she said that any quantity of fentanyl can cause a death that's at appendix three 32. She was quite clear when she said that the level of fentanyl in Michael Agno's blood, 14 nanograms per milliliter was quite high. That's at appendix three 29. Um, and she said that that was a fatal concentration of fentanyl. So her testimony didn't differ from Dr. Powers. I think we've covered the, uh, expert testimony fairly thoroughly. I'd like you to address the excited utterance objection, even on, um, abuse of discretion review, um, that the admission of the testimony that Fife said, uh, when she ran over to the police, she told him, I know who did this. I'll tell you everything. I know where he lives and his name is Paul. I know who did this. You know, your response to that, um, is, has been that, well, she had personal knowledge that, uh, he had been getting drugs from Paul van Manen. But to me, this is, um, a very direct statement that she knows about who had responsibility for this death, um, in a, in a way that isn't just, uh, uh, uh, supported by the fact that had personal knowledge of their prior drug dealings. So I don't, I'm having trouble understanding why it wasn't prejudicial and unfairly prejudicial to admit this, um, statement, which was in a triple hearsay context, I believe as well. Let's see. No, she said that she, she testified during trial, but I'm having trouble understanding why it wasn't prejudicial to admit it. Could you address that concern? Certainly your honor, uh, on the prejudice issue, the evidence that Paul van Manen provided the drugs, which resulted in Michael Agno's death was extraordinarily overwhelming. Uh, putting aside Ms. Fife's testimony for a moment, there was text messages the morning that Michael Agno died. There was testimony from MoneyGram indicating that he picked that Paul van Manen picked up money that Michael Agno sent him just a mile from Michael Agno's house. Um, there were texts between, uh, on the course of a T3 that Paul van Manen and Michael Agno had this ongoing relationship. All that testimony is very strong and the jury might well have found the same way, but a statement, I know he did it, is much more powerful. So I'd like you to defend the admission of that statement and explain where the personal knowledge was. Whether it's harmful or not, we'll have to decide ourselves. We really don't need the argument of that, but we do need argument on the question of personal knowledge. Certainly your honor. So it was not an abusive discretion for Judge Crotty to decide that there was evidence sufficient to support a finding that Jessica Fife had personal knowledge of it. And I think it's important for this court to note that Judge Crotty did not make that choice until Jessica Fife testified. And Jessica Fife testified as follows. She testified that she understood a man named Paul was Michael Agno's primary heroin dealer. She testified about numerous interactions the two of them had. She testified to driving Michael Agno on approximately five occasions to a hotel in New Jersey where Michael Agno purchased heroin from Paul. And that testimony was corroborated by testimony of other witnesses, including Detective Tricelli, who surveilled Paul at that same hotel, among other things. But this case, what Jessica Fife testified to, the excited utterance, which I would argue is just a minor part of her testimony, is very similar to United States v. Tocco. In that case, this court admitted as an excited utterance and found that there was sufficient personal knowledge under 602 for the declarant to say, Mario and I lit a building for Jack. In that case, the declarant did not testify and was not subject to cross-examination. Of course, Ms. Fife was here. But more to the point, the evidence that the building was lit for Jack, which is what the defendant objected to, the for Jack, was limited to two aspects. First, that the declarant knew that the building was opened by a key provided to Mario, and the declarant knew that Jack frequently asked Mario and Mario's friends to help with issues related to the business that was set ablaze. Here, there is a lot more evidence to show that Jessica Fife had a sufficient personal knowledge for a reasonable fact finder to find that she understood what she was talking about. She understood the relationship between Michael Agno and Paul Van Manen. It's the extent she didn't. But the only thing that she really had personal knowledge of from what you've said is that he had procured drugs from Van Manen in the past, right? I mean, she didn't know because she didn't see which drugs he took, and she couldn't preclude the possibility that he had procured them from somebody else. When she said, I know who did this, that was not from personal knowledge, wouldn't you agree? Did she know? No, you're right. The government would disagree with that. The government would say that there was sufficient evidence to show that she had personal knowledge that Michael Agno bought drugs from Paul Van Manen. And the late at night, early morning, when she discovered her boyfriend's body lying crumpled up on the floor of his bedroom, surrounded by drug paraphernalia and heroin envelopes. Is there any evidence that she knew that he did not buy from anybody else? There is evidence that she understood that there were various people that he had texted with a long time ago. And that all came out of trial. And she was subject to cross-examination about all of these issues, including that she wasn't with Michael Agno on the night that he had died. But she knew that Michael Agno and Paul Van Manen had a relationship where Paul Van Manen provided drugs to Michael Agno. And so when she found his body... Counsel, can I ask, is there a difference between the personal knowledge requirement to support admission of an excited utterance and the personal knowledge requirement required for live testimony right there in the witness seat? Is there a difference? No, the standard is the same, but I would say that there is a difference. Hang on. So let me ask you this. Do you honestly think that on direct examination of Ms. Fife, you could have asked the following question? Ms. Fife, do you know who did this to Mr. Agno? Could she have said, do you think you could have elicited her to say, yes, it was Paul Van Manen? Really? So, Your Honor, I think that speaks to a very important point, which is the... Let's start from the yes or no. So the answer to that question, Your Honor, would be seeking lay opinion testimony. And I think it would be subject to lay opinion testimony standards. But what's different here and what's... No, hang on. If we apply... Yeah. As a lay opinion, I don't think that the record would establish that. But what's important here... So why is that not lay opinion? Why is it not admissible or not as an excited utterance? The reason... Either as lay opinion or not. The reason, Your Honor, is because this is an excited utterance. And the reason that the federal rules of evidence permit excited utterances to be that what they're saying is reliable under the belief... So it seems to me you're arguing that when someone's in an agitated state, we are going to require less personal knowledge and allow more inferences in than we would if they're on the witness stand? See, that doesn't make sense to me. I thought it was the same standard regardless of whether they're on the witness stand or whether they're running around the street agitated. Are you suggesting that there's a lesser requirement of personal knowledge for the excited utterance? So, Your Honor, what I'm suggesting is that there's a difference between an excited utterance and a present sense impression. And a present sense impression is something that someone had just seen. I see him over my time. Please take your time and answer, Judge Nardini. Thank you, Your Honor. There's a difference in the federal rules of evidence recognize, and this court's decisions recognize, that there's a difference between a hearsay admission when someone sees something and immediately expresses it, and when someone is in an excited state and therefore their declarations are believed to be more reliable. But as I pointed out, what Jessica Fyfe did... An excited utterance could be a statement regarding something the person had learned the day before, right? So she could have said to the police, Paul Van Manen is the victim's regular drug dealer. I know where he lives. He regularly sold drugs to my boyfriend. No problem there, right? Every bit of that is based on her personal perceptions in the past. So I think present sense impression is mixing something else up about something that they're seeing at the moment they speak. My question is, isn't there a difference between lay opinion, which is drawing inferences from stuff you know, right? Those are two different things. And isn't the first component of this excited utterance a lay opinion? And my point is, maybe that's admissible as an excited utterance if it would be admissible lay opinion. If you could ask her that question on direct, isn't it also true that you could let it in as an excited utterance? And I think where I was getting at is I can't imagine a world where you could ask that question on direct and get away with it. And if that's true, how can you get it in as an excited utterance? And maybe- So your honor, I think the hearsay rules frequently allow testimony to be admitted because it was hearsay, there's an exception to it or an exclusion. You are, you're still ducking the question. The fact that it is an excited utterance allows us to believe that the person who made it really believes it without cross-examining that person. But the question of whether that person had the kind of knowledge that would the personal knowledge matter goes to. And if somebody is on the stand and makes a statement, which is an overstatement, you can by cross-examination of the other side can say, hey, that ain't what you're saying. And that is there and before the jury. But if instead it comes in by way of hearsay, there is no way of cross-examining and questioning the existence of personal knowledge, which is why that's a problem because excited utterance does nothing to support the existence of personal knowledge in a way- Please respond to judge Calabrese and then we'll hear a bubble. Thank you. Thank you, your honor. Well, in this case, I think it's important to note and unlike in Tocco, which this court affirmed a similar situation, Jessica Fife was cross-examined and the limits of her knowledge were made very clear to the jury. And that was argued extensively during closing. So even if there is any error here and the government doesn't believe there is, the government doesn't believe judge Crotty abused his discretion on this regard, any error is certainly harmless because all of the limits of her knowledge were made plain to the jury. Very good. Thank you very much. We have the argument. We'll hear rebuttal. Mr. Yanella, you have two minutes. Yes. So the answer is no. The government would never have even asked that question based upon the foundation that was laid. And your honor's question was that if he had asked that question, would he have, would it have an objection have been sustained? And certainly the prosecutor is trying to push this back to the hearsay rule, but the focus as your honors obviously understand is on rule 602, the need for personal knowledge and the case of United States versus Tocco, which the government is relying on. Okay. Counsel, uh, but to you instead, I would like you to argue why there wasn't so much evidence that it was your client that did it with this fact, even if it was erroneous, was not harmless. That is basically what she has said was he bought these drugs from your client rather than from somebody else. That's the thing as to which I think there's an error with respect to hearsay. I want to know why that error isn't harmless. Okay. So I won't distinguish Tocco, but it's, it's so easily distinguished. So to answer your honor's question, uh, I would focus on the fact that, uh, uh, there was evidence that the, uh, deceased Michael Agno, uh, had other dealers. Uh, he, uh, in 0.3, um, I bring up the fact that, uh, the decedent's brother told Fife that it might've been another dealer who had supplied the drugs in question. Uh, another issue is that on the bed next to Michael Agno was a, a very long needle, the type used to inject steroids. Uh, and, uh, uh, Derek Young, who testified that he injected steroids with, um, Michael Agno testified that they had never used that type of needle, such a large needle to inject heroin, which suggests that the fentanyl that caused the death of Mr. Agno was not necessarily mixed in with any fentanyl and certainly not mixed in with, with, uh, I'm sorry, was not mixed in with heroin and certainly was had provided. There was another, uh, heroin dealer, uh, uh, and a Xanax dealer, I believe named, um, uh, uh, uh, uh, uh, Angel Jim. He was referred, he was saved in the phone as Angel Jim. The, uh, the deceased had had contact with that other dealer in the, in the very, in the days leading up to the death. Um, then you had the whole issue of the bias of the officers who did not check what was inside that, uh, I'm going to call it the needle to inject steroids, the large needle. They didn't do a laboratory test on that needle. Uh, they didn't check the two phones. They only checked one phone. Um, the detectives were very evasive as I summarize in three of my brief on whether or not, or about how they failed to follow up on these leads that other, uh, dealers might have provided the fatal drugs. So there were other, were other angles, uh, and other, um, possible, uh, guilty parties. And the defense was not allowed as I argue in 0.3 to follow up on that. And then of course my client testified, uh, and he denied having supplied the heroin, much less heroin laced with fentanyl. Thank you. Thank you very much. I think we have the arguments. Um, we will take the matter under advisement. Well argued. Thank you. Thank you.